IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE DRAMATIC PUBLISHING COMPANY, ) ) ) | |
| Petitioner, ) ) | |
| vs. ) ) | Case No. 21 C 5541 |
| TONJA CARTER, et al., ) ) | |
| Respondents. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This lawsuit and underlying arbitration concern the stage rights to adaptions of Nelle Harper Lee's novel, *To Kill a Mockingbird*. In 1969, Lee granted The Dramatic Publishing Company (Dramatic) exclusive rights to license amateur acting rights to dramatizations of her novel. Almost 50 years later, Lee terminated that grant and transferred the novel's stage rights to Rudinplay, Inc.

The Rudinplay agreement prompted Dramatic to sue Lee's Estate and the related Harper Lee, LLC (collectively the Estate). The dispute ended up in arbitration under the 1969 agreement, and the arbitrator entered an award in favor of Dramatic. For the reasons below, the Court grants the Estate's motion in part and denies Dramatic's motion to confirm the award as modified. The Court agrees with Dramatic that it is entitled to attorney's fees, the amount of which the Court will determine at a later date.

### Background

Harper Lee wrote the American classic, *To Kill a Mockingbird*, in 1960. Nine

years later, she signed a contract with Dramatic that granted the production company an exclusive right to prepare a dramatization of the novel. This agreement granted Dramatic the "complete right throughout the world . . . [t]o lease the amateur acting rights in and to" the novel. Resp'ts' Mot. to Vacate, Ex. A ¶ 2 (dkt. no. 22-2). Conversely, Lee "reserve[d] all rights not expressly granted to [Dramatic], including but not limited to the professional acting . . . rights." *Id.*

In April 2011, Lee notified Dramatic that she was terminating the grant of rights effective April 2016, pursuant to subsection 304(c) of the Copyright Act—a provision that permits copyright owners to reclaim licensed works under certain conditions. *See* 17 U.S.C. § 304(c). Four years later in June 2015, Lee entered into an agreement with Rudinplay, Inc. This contract gave Rudinplay all stage rights to the novel "subject to the rights granted under the [1969 agreement], as limited by [Lee's] termination." Resp'ts' Mot. to Vacate, Ex. E ¶ 2(b) (dkt. no. 22-6). Aaron Sorkin then wrote the play that the Rudinplay agreement authorized, and Atticus LLC obtained the rights granted to Rudinplay.

After the Sorkin play debuted, Dramatic filed an arbitration demand against the Estate pursuant to the original 1969 agreement and later added the LLC as a party.[1] Dramatic claimed that the respondents had breached the 1969 agreement and tortiously interfered with contracts that Dramatic had with various licensees. The respondents filed a counterclaim against Dramatic, alleging that Dramatic had breached the 1969 agreement.

---

[1] Lee died in February 2016, and Tonja Carter serves as the representative of the Estate. The Estate succeeded Lee's rights under the 1969 agreement.

The arbitrator entered a 91-page interim award on October 21, 2021 that rejected the respondents' counterclaims and largely found them liable on Dramatic's claims. *See* Interim Arbitration Award (dkt. no. 21). In an extensive examination of the record, the arbitrator first interpreted the original 1969 contract and concluded that the original grant to Dramatic consisted of all "non-first-class rights," a term that references a three-tier classification of theaters. *See id.* at 9–29. Specifically, the term non-first-class rights, as interpreted by the arbitrator, denotes rights to productions in regional and community theaters, as opposed to Broadway productions. The arbitrator premised this finding on the testimony of expert witnesses, trade usage of certain contractual terms, and the practices of the parties over the years. This finding resolved the parties' respective breach of contract claims.

The arbitrator also analyzed the legal effect of Lee's termination of Dramatic's rights in determining what declaratory relief to award. *See id.* at 61–71. Subsection 304(c) of the Copyright Act provided the framework for that analysis, as it is the provision that describes when a copyright owner may terminate the grant of an exclusive license and what the grantee retains after such a termination. 17 U.S.C. § 304(c). This provision also contains a "Derivative Works Exception," which specifies that "a derivative work prepared under authority of the grant [of a license] before its termination may continue to be utilized under the terms of the grant after its termination." *Id.* § 304(c)(6)(A). The arbitrator concluded that according to the statutory exception, Dramatic maintained the right to continue exclusively licensing the non-first-class rights play rights to the novel, notwithstanding Lee's termination of its license.

Lastly as relevant to this decision, the arbitrator awarded not just damages but

3

also equitable relief that obligated the Estate to indemnify Dramatic against lawsuits brought by Rudinplay and other similar third parties. See Interim Arbitration Award at 7 (dkt. no. 21). These indemnification obligations only appear at the beginning of the award under the "Other Findings and Relief" header; the award does not connect them to the original 1969 contract indemnification obligations.

On November 11, 2021, Dramatic filed a motion to confirm the interim award as modified. On January 14, 2022, the respondents filed a cross-motion to vacate the award. The arbitrator entered a final award on January 28, 2022, that incorporated the interim award and finalized costs and attorney's fees.[2]

## Discussion

Under the Federal Arbitration Act (FAA), "arbitration awards are largely immune from . . . scrutiny in court." *Cont'l Cas. Co. v. Certain Underwriters at Lloyds of London*, 10 F.4th 814, 816 (7th Cir. 2021). Vacating an award is permitted in only four circumstances, just one of which is relevant to this case: "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Modifying an arbitration award is permitted in only three circumstances. 9 U.S.C. § 11(c). Put simply, the available judicial review is "tightly limited." *Standard Sec. Life Ins. Co. of N.Y. v. FCE Benefit Adm'rs, Inc.*, 967 F.3d 667, 671 (7th Cir. 2020).

A.  **Respondents' motion to vacate**

The respondents raise three arguments for why the Court should vacate the

---

[2] Dramatic's motion to confirm the final award has been stayed pending ruling on the motions concerning the interim award. Because the final award incorporates the interim award, the Court will refer to the latter as "the award" throughout the opinion.

arbitrator's award: 1) the award imposed an indemnification obligation that is overly broad and beyond the scope of the arbitrator's authority; 2) the arbitrator's interpretation of the Copyright Act will force the Estate to violate the legal rights of third parties; and 3) the award is ambiguous in its use of the term "non-first-class rights."

### 1. Indemnification obligations

The arbitration award requires the Estate to indemnify Dramatic for any lawsuits brought against Dramatic by certain third parties, such as Dramatic's licensees and Rudinplay. *See* Interim Arbitration Award at 7 (dkt. no. 21). These indemnification obligations also extend to any lawsuits against Dramatic based on the transfer of non-first-class rights. As noted above, the arbitrator did not expressly explain his imposition of these obligations. This, at least in part, drives the parties' dispute over whether the obligations are overly broad and fall beyond the scope of the arbitrator's authority.

The respondents argue that the indemnification obligations were inappropriately imposed because they extend beyond the terms of the 1969 agreement and cover matters that are not yet in controversy. By way of example, the Estate is concerned with the possibility of a Dramatic licensee suing Dramatic over an entirely unrelated play and triggering the indemnity obligation given its broad language. For its part, Dramatic contends that the indemnification obligations imposed by the arbitration do not derive from the 1969 agreement itself but instead represent entirely new relief, which is permissible due to the lack of limitations in the original 1969 agreement. In supporting the imposition of these obligations, Dramatic points to the arbitrator's finding in Dramatic's favor on the question of tortious interference.

Two provisions in the 1969 agreement between Lee and Dramatic are potentially

relevant to this dispute. Section 1(b) of the agreement states: "[Ms. Lee] will defend, indemnify and hold harmless [Dramatic] from and against any monetary losses or other losses whatsoever, including reasonable attorney's fees, caused by reason of the breach or alleged breach of any agreement and/or representation made herein by [Ms. Lee]." Resp'ts' Mot. to Vacate, Ex. A ¶ 1(b) (dkt. no. 22-2). Section 4(k) of the agreement specifies that "[a]ny controversy arising out of this agreement is to be arbitrated." *Id.* ¶ 4(k). The Court will refer to these two provisions as the indemnity and arbitration clauses.

It appears correct, as the respondents note, that the indemnification obligations imposed in the arbitration award extend beyond the 1969 agreement's indemnity clause. Dramatic does not dispute this.

But the 1969 indemnity clause is not what gave the arbitrator authority to resolve the parties' dispute. That authority came from the arbitration clause. The Seventh Circuit has noted that in the context of an arbitration clause, the term "'arising out of' reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1033 (7th Cir. 2012) (quoting *Sweet Dreams Unlimited, Inc. v. Dial–A–Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir.1993)). Furthermore, "arising out of" language "necessarily creates a presumption of arbitrability, which requires that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* at 1034 (cleaned up). The controversy that gave rise to the arbitration stems from stage licensing rights to *To Kill a Mockingbird*, which unquestionably implicates the 1969 agreement's arbitration clause. The Estate does not dispute this.

6

Once parties properly enter arbitration, the arbitrator has wide discretion. He "acts as the parties' agent and as their delegate may do anything the parties may do directly." *George Watts & Son, Inc. v. Tiffany & Co.*, 248 F.3d 577, 580 (7th Cir. 2001). Put differently, a court "must treat the arbitrator's award as if it represented an agreement between" the parties themselves. *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 577, 580 (2001).

The indemnification obligations imposed as part of the arbitration award fall squarely within the arbitrator's discretion. Arbitrators can award a "wide range of remedies" to ensure "successful arbitration," and indemnification is one such remedy. *Yasuda Fire & Marine Ins. Co. of Eur., Ltd v. Cont'l Cas. Co.*, 37 F.3d 345, 351 (7th Cir. 1994). The Court notes, in this regard, that the arbitrator found the Estate liable not just for breach of contract but also for tortious interference with contract—specifically interference with Dramatic's contracts with its licensees. *See* Interim Arbitration Award at 81–85 (dkt. no. 21). Although the arbitrator did not in so many words connect the indemnification obligations to his tortious interference finding, it makes sense that the new obligations arise from that finding in that they broadly cover situations in which Dramatic licensees sue Dramatic.

An argument can be made that the arbitrator could have tailored the indemnification obligations he imposed so that they *expressly* referenced lawsuits that concern *To Kill a Mockingbird*. But that is plainly what he meant, and in any event the possibility that the arbitrator could have tailored his award more narrowly does not mean that he exceeded his power such that the FAA would allow this Court to vacate the award. *Cf.* 9 U.S.C. § 10(a)(4). Put simply, the indemnity provision in the agreement

7

was not a limitation on the arbitrator's power, particularly when it came to dealing with tort claims. *See Prostyakov v. Masco Corp.*, 513 F.3d 716, 725 (7th Cir. 2008) (explaining how "[n]othing in the Agreement limited [the arbitrator's] authority to fashion [the] equitable award.").

For these reasons, the Court finds no basis to vacate the award based on the indemnification obligations imposed by the arbitrator.

### 2. Violation of third-party rights

An arbitrator cannot require the parties to violate the legal rights of third parties who did not consent to arbitration. This rule follows from the general principle that an "arbitration implements contracts, and what the parties cannot do through express contract they cannot do through an arbitrator." *Affymax, Inc. v. Ortho-McNeil-Janssen Pharms., Inc.*, 660 F.3d 281, 284 (7th Cir. 2011); *see also Hyatt Franchising, L.L.C. v. Shen Zhen New World I, LLC*, 876 F.3d 900, 903 (7th Cir. 2017).

The respondents argue that one provision of the award directs the Estate to violate the rights of third parties, particularly Aaron Sorkin and Atticus LLC.[3] Specifically, the respondents point to the requirement that they refrain from helping Rudinplay and its affiliates, which includes Sorkin and Atticus, license Rudinplay's version of *To Kill a Mockingbird* for any non-first-class production. *See* Interim Arbitration Award at 6 (dkt. no. 21). The respondents' argument consists of three key premises: first, Lee received the non-first-class rights as a result of termination,

---

[3] The respondents also contend that the award will "adversely affect" the legal rights of members of the general public because they will not be able to see the Sorkin play outside of first-class theaters. This argument lacks merit. The public does not possess a legal right to see a particular version of a play, let alone in particular locations.

8

meaning the arbitrator erred in interpreting the Copyright Act; second, Rudinplay obtained the legal right to license the play for non-first-class productions from Lee; and third, enjoining the respondents from assisting Rudinplay and its affiliates to license the play suffices as a violation of third-party rights that warrants vacating the award. Accepting all three premises is necessary as a basis to vacate the award because legal error is not a legally permissible basis to vacate an arbitrator's award. *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 563 (7th Cir. 2008).

Much of the briefing focuses on the first premise—determining what rights a grantee retains, and the exclusivity of those rights, following termination under the Copyright Act. But the Court need not address whether the arbitrator erred on that issue, because the Estate's argument falls short on the second premise regardless. The second premise turns on the proposition that Rudinplay actually obtained the non-first-class rights from Lee: if Rudinplay did not receive those rights, then it has no right to license its version of the play in non-first-class theaters. Sorkin and Atticus would be in the same boat as well, as their rights are tied to Rudinplay.

Dramatic argues that Rudinplay did not receive non-first-class rights from Lee based on the terms of the Rudinplay Agreement itself. Paragraph 2(b) of that agreement states the following:

> [Lee] represents that [she] has terminated the Prior Agreement [with Dramatic] effective April 26, 2016. [Rudinplay] acknowledges that, notwithstanding such termination, the amateur acting rights to the Prior Adaptation continue to be exploited following such termination on a non-exclusive basis in the United States, and on an exclusive basis elsewhere. *The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination.*

Resp'ts' Mot. to Vacate, Ex. E ¶ 2(b) (dkt. no. 22-6) (emphasis added). In short, this

9

clause says that the rights granted to Rudinplay are subject to those previously granted to Dramatic. This limitation means that if Dramatic is properly found to have retained the right to produce the play in non-first-class theatres, then Rudinplay did not acquire that right.

This is exactly what transpired. The arbitrator determined that following Lee's termination of the license, under the Derivative Works Exception, Dramatic continues to exclusively hold all non-first-class rights. Thus by the terms of the Rudinplay Agreement, Rudinplay does not own the non-first-class rights—as they never returned to the Estate following its termination of Dramatic's license. The arbitrator put it this way: "Because Rudin's rights are subject to Dramatic's rights under the terms of 1969 Agreement, and because Dramatic's exclusive rights are preserved by the Derivative Works Exception, it follows that Rudin has no stock and amateur rights for live theatrical productions of [the novel]." Interim Arbitration Award at 71–72 (dkt. no. 21).

In short, Rudinplay did not acquire the right to license its version of the play in non-first-class theaters. This means that the arbitration award cannot possibly direct the Estate to violate the rights of third parties like Sorkin and Atticus, as they do not have a legal right to license the play in non-first-class theaters either. The Court concludes that vacating the award on this basis is not appropriate.

### 3. Non-first-class rights ambiguity

One of the central disputes that the arbitrator was tasked with resolving was determining what rights Lee granted to Dramatic under the 1969 agreement and what rights Dramatic retained following her 2016 termination of those rights. The relevant grant language reads as follows:

> The Owner [Miss Lee] hereby grants to the Publisher [Dramatic] the complete rights throughout the world:
>
>> (a) To write or caused to be written a dramatization based upon and/or adapted from the Property [the Novel], but agrees that said dramatization (herein called the "Play") is to be the only one the amateur acting rights of which the Owner will permit to be leased and/or licensed; and the Owner reserves all rights not expressly granted to the Publisher, including but not limited to the professional acting, radio broadcasting, television and motion picture rights;
>
>> (b) To lease the amateur acting rights in and to the Property and/or the Play and/or parts thereof;

Resp'ts' Mot. to Vacate, Ex. A ¶ 2 (dkt. no. 22-2). The contract further provided the following definition for the term "amateur acting rights":

> The phrase "amateur acting rights" as used herein shall mean performances by living actors in the immediate presence of an audience and shall include all performance rights for little theatres, community theatres and/or drama associations, colleges, universities, high school and other school groups, churches, clubs and other amateur organizations or groups therein or connected therewith, together with all stock, repertoire, lyceum and Chautauqua performances whether any or all of the abovementioned performances are given by paid and/or unpaid actors, but shall not include Broadway production rights nor first-class professional road and/or first-class touring production rights.

*Id.* ¶ 4(e).

The arbitrator found the definitional provision instructive. Although there was a "clear dichotomy" between "amateur acting rights" and "stock rights"[4] in the definitional provision, the arbitrator found that both of these sets of rights were included in the grant to Dramatic and were distinguishable from "Broadway production rights" and "first-class touring production rights." *See* Interim Arbitration Award at 10–11 (dkt. no. 21).

---

[4] The arbitrator used the shorthand term "stock rights" to refer to the contractual language "all stock, repertoire, lyceum and Chautauqua performances." *See* Interim Arbitration Award at 10 n.4 (dkt. no. 21).

11

Recognizing, however, that much of this language consisted of "terms of art in the theater industry" that "do not have a single consistent, uniform meaning," the arbitrator adopted the term "non-first-class rights" as a descriptor of what Dramatic owned. *Id.* at 11. This descriptor also mapped on to the three classes of theater productions in the business today: 1) first class/Broadway; 2) regional/resident/repertory; and 3) community/local. *Id.* at 12. The arbitrator accordingly issued the following declaratory relief as part of the award: "Under the 1969 Agreement, Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* ('non-first-class rights') and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights." *Id.* at 6.

The respondents argue that the term "non-first-class rights," as used in the arbitrator's award, is ambiguous. They are particularly concerned with the award's declaratory relief, and they contend that the lack of a clear definition of "non-first-class rights" leaves the Estate uncertain of its future rights under the award. As a specific example, they point to an instance where the award reserves to the Estate the rights to off-Broadway productions. According to the Estate, these off-Broadway rights sometimes fall within the second class of theaters listed above, and thus the award is inconsistent in saying that Dramatic exclusively holds all non-first-class rights while reserving off-Broadway rights to Lee. Because of this uncertainty, the Estate asserts that the award should be remanded for clarification.

An arbitrator's award must be enforced as written, but if it is "too ambiguous to be enforced," a court may remand the matter back to the arbitrator for clarification. *Bhd. of*

12

*Locomotive Eng'rs v. Union Pac. R.R. Co.*, 500 F.3d 591, 592 (7th Cir. 2007); *see generally Colonial Penn Ins. Co. v. Omaha Indem. Co.*, 943 F.2d 327, 333–34 (3d Cir. 1991) ("Although there is no explicit provision in the [FAA] for such a remand, courts have uniformly stated that a remand to the arbitration panel is appropriate in cases where the award is ambiguous."). An award is ambiguous if it "is susceptible to more than one interpretation." *Bhd. of Locomotive Eng'rs*, 500 F.3d at 592 (quoting *Green v. Ameritech Corp.*, 200 F.3d 967, 977 (6th Cir. 2000). The Seventh Circuit has recently emphasized, however, that courts should, "if possible, resolve apparent ambiguities by examining the arbitrator's opinion and the record.'" *Nano Gas Techs., Inc. v. Roe*, 31 F.4th 1028, 1031 (7th Cir. 2022) (quoting *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. PPG Indus., Inc.*, 751 F.3d 580, 585 (7th Cir. 2014)). Accordingly, the threshold issue is whether the term "non-first-class rights" as used in the award is ambiguous, and if so, whether the record resolves the ambiguity such that the parties can be reasonably certain of their rights moving forward.

The Court concludes that the arbitrator's use of the term "non-first-class rights" is ambiguous due to the imprecision of the dividing line between first-class and other rights. Critically, the award does not offer a definitive definition of what the term "non-first-class-rights" encompasses, and even Dramatic concedes in its response brief that "the exact boundary of first-class [rights] may be gray." Resp. to Resp'ts' Mot. to Vacate Arbitration Award at 25 (dkt. no. 32).

The classification of off-Broadway productions illustrates this. On the one hand, the award states that off-Broadway productions are an example of "non-stock professional acting rights" (i.e. first-class rights) reserved to the Estate. Interim

13

Arbitration Award at 27 (dkt. no. 21). The respondents read this statement to mean that the Estate owns the rights to all off-Broadway productions. But the arbitrator's award immediately follows this statement with a citation to the testimony of Dramatic's president, in which he explained that the classification of off-Broadway productions depends on the contract. *See* Resp. to Resp'ts' Mot. to Vacate, Ex. K at 3235–36 (dkt. no. 32-11) (testifying that "a commercial first-class open-ended run on an off-Broadway contract . . . would fall to Ms. Lee," whereas "an Equity mini-contract or showcase code production off-Broadway . . . would fall to [Dramatic]"). Dramatic contends that the arbitrator "adopted [the president's] testimony that in some cases an off-Broadway production could constitute a first-class production, but in others, an off-Broadway production would be a stock [second-class] right." Resp. to Resp'ts' Mot. to Vacate at 24 (dkt. no. 32). This supports the proposition that the award is ambiguous in this particular respect.

The rest of the award and record do not resolve this ambiguity, and if anything, show the need for greater clarity so that the parties can avoid future litigation. The award discusses how there are "several non-dispositive and non-exclusive factors that may be useful in determining whether a production is first-class." Interim Arbitration Award at 31 (dkt. no. 21). These factors include, for example, the presence of investors, SEC filings, and membership in the Society of London Theater (SOLT). The award also explains that the "mere fact that one or more professional actors appear in a production" does not control whether a production is first class either. *Id.* at 26. The award even quotes an industry expert who admits "that there is not always a bright line between first-class productions and secondary rights productions" and that "there are

14

sometimes grey areas." *Id.* at 32. Put simply, the arbitrator's award does not delineate the boundary of first-class versus non-first-class rights.

Dramatic's final argument that "precision is unnecessary" does not carry the day. An injunction order—which is what we are talking about here—must "be precise and self-contained, so that a person subject to it who reads it and nothing else has a sufficiently clear and exact knowledge of the duties it imposes on him." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998); *see also Patriot Homes, Inc. v. Forest River Hous., Inc.*, 512 F.3d 412, 415 (7th Cir. 2008) (explaining that an injunction's "requirement of specificity spares courts and litigants from struggling over an injunction's scope"). As the award is currently described, there is uncertainty regarding the dividing line between first-class and non-first-class rights. The proposition that a determination of first-class versus non-first-class rights may sometimes come down to the specifics of a particular contract, as exemplified by some off-Broadway productions, reflects this: it suggests the possibility of litigation any time a contract in this gray area is entered into.

The Court concludes that the award's use of the term "non-first-class rights" is ambiguous and requires remand to the arbitrator for clarification.

**B.      Dramatic's motion**

Dramatic asks the Court to confirm a modified award that extends the judgment. Dramatic also asks the Court to award attorney's fees associated with the federal court litigation.

**1.      Judgment language**

Dramatic asks the Court to confirm a modified award that extends the judgment

15

to "all persons who are in active concert or participation with the Respondents." Resp. to Resp'ts' Mot. to Vacate Arbitration Award at 29 (dkt. no. 32). Dramatic contends this is a *pro forma* request to align the judgment's language with Federal Rule of Civil Procedure 65, which provides that any injunction order binds "other persons who are in active concert or participation" with the parties. Fed. R. Civ. P. 65(d)(2).

Because the Court is remanding the case to the arbitrator for clarification of the term "non-first-class rights," the Court cannot simultaneously confirm the award, whether modified or not. The Court therefore denies this request without prejudice to renewal.

The Court, however, notes that Dramatic's proposed modification is essentially a simple matter of form. Federal Rule of Civil Procedure 81(a)(3) states that in proceedings under the FAA, the federal rules "apply only to the extent that matters of procedure are not provided for in those statutes." Fed. R. Civ. P. 81(a)(3). The FAA does not provide any further procedure relating to injunctions that might otherwise cover the subject matter of Rule 65. So regardless of whether Dramatic formally requests the modification, the eventual judgment will be subject to Rule 65 and necessarily bind those in active concert.

### 2. Attorney's fees

Dramatic also asks the Court to award attorney's fees associated with the litigation in federal court. Although the FAA typically bars fees, a preexisting contractual agreement can nevertheless authorize such an award. *See Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir. 1994); *see also Hyatt Franchising*, 876 F.3d at 903 (permitting attorney's fees beyond a fee-shifting clause when the losing party "pointlessly extend[s]"

the arbitration in federal court).

That is the case here. The indemnity provision of the 1969 agreement requires Lee to pay "reasonable attorney's fees" that are caused by "breach or alleged breach of [the] agreement." Resp'ts' Mot. to Vacate, Ex. A ¶ 1(b) (dkt. no. 22-2). The arbitrator concluded that the Estate breached the 1969 agreement, and Dramatic has incurred attorney's fees and expenses in the present case defending against the respondents' motion to vacate.

Although the Court is remanding the award for clarification on a specific term, that clarification will not alter the arbitrator's bottom-line conclusion that the Estate breached the 1969 agreement, which is what triggers Dramatic's entitlement to attorney's fees. Accordingly, the Court concludes that Dramatic is entitled to attorney's fees under the 1969 agreement, the amount of which the Court will determine at a later date, following clarification by the arbitrator of the "non-first-class rights" term.

## Conclusion

For the reasons stated above, the Court denies the respondents' motion to vacate the interim award of arbitration [dkt. no. 22] but remands the case to the arbitrator for clarification of the term "non-first-class rights" as discussed within this opinion. The petitioner's motion to confirm [dkt. no. 10] is terminated without prejudice to renewal following the arbitrator's decision on remand. A joint status report is to be filed on July 1, 2022, and the case is set for a telephonic status hearing on July 6, 2022 at 9:15 a.m., using call-in number 888-684-8852, access code 746-1053.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 17, 2022