# Exhibit B

| | |
|---|---|
| **From:** | Kevin Tottis |
| **To:** | Proposed_Order_Kennelly@ilnd.uscourts.gov |
| **Cc:** | Melissa_Astell@ilnd.uscourts.gov; Max A. Stein; Keith Stolte; Eaton, J. Timothy; Murphy, Andrew S.; Hymer, David; McDaniel, Riley |
| **Subject:** | FW: Dramatic Publishing v. Carter, et al, Case No. 21-cv-05541 DRAFT JUDGMENT |
| **Date:** | Thursday, January 12, 2023 4:42:53 PM |
| **Attachments:** | Estate form with Dramatic proposed changes.docx |
| | Dramatic v. Carter - Points of Disagreement.pdf |

**CAUTION - EXTERNAL EMAIL**

Dear Judge Kennelly,

Attached is a copy of the Draft Judgment and joint submission from the parties we send on January 4, 2023 pursuant to the Court's Order. (See email below.) Pursuant to Ms. Astell's instructions, I am copying her on this email.

Kevin Tottis

Kevin Tottis

TottisLaw

401 N. Michigan Avenue

Suite 530

Chicago, IL 60611

(312) 527-1400

(312) 527-1450 (direct)

(312) 589-7192 (fax)

www.tottislaw.com

**Please note our new address.**

**From:** Kevin Tottis
**Sent:** Wednesday, January 4, 2023 9:54 PM
**To:** Proposed_Order_Kennelly@ilnd.uscourts.gov
**Cc:** Keith Stolte ; Max A. Stein ; Eaton, J. Timothy ; Murphy, Andrew S. ; Hymer, David ; McDaniel, Riley
**Subject:** Dramatic Publishing v. Carter, et al, Case No. 21-cv-05541 DRAFT JUDGMENT

Pursuant to the Court's order, counsel met and conferred on a proposed judgment. The parties continued to meet and confer on changes. The attached reflects the Respondents' draft judgment form along with Dramatic's points of disagreement in redline. The parties also thought it would be helpful to explain their positions regarding disagreement, which we have included in the attached PDF.

Kevin Tottis

Kevin Tottis

TottisLaw

401 N. Michigan Avenue

Suite 530

Chicago, IL 60611

(312) 527-1400

(312) 527-1450 (direct)
(312) 589-7192 (fax)
www.tottislaw.com
**Please note our new address.**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE DRAMATIC PUBLISHING COMPANY, ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> TONJA CARTER, et al., ) <br> ) <br> Respondents. ) | Case No.: 1:21-CV-05541-MFK |

**FINAL JUDGMENT**

This case was initiated by Petitioner Dramatic Publishing Company ("Dramatic") on October 19, 2021, following arbitration proceedings against Respondents The Estate of Nelle Harper Lee, by and through its personal representative Tonja Carter (the "Estate"), and Harper Lee, LLC ("LLC"). This case involved motions to confirm and cross-motions to vacate several awards entered in the arbitration proceedings.

In accordance with the Court's previous Memoranda and Orders, Judgment is hereby entered in favor of Petitioner Dramatic and against Respondents, and it is hereby **ORDERED AND ADJUDGED** that:

1. The Corrected Final Award is **CONFIRMED** (([Doc. 35.1));]);

2. Pursuant to the Corrected Final Award, the Estate and LLC are joint and severally liable for $2,577,204.00 in attorneys' fees and costs. (The Estate and LLC already have satisfied this sum.) [1]

---

[1] On September 28, 2022, the Estate transferred to Dramatic $2,580,417.42, which represented the fees and costs in the Corrected Final Award plus the 9% interest that accrued after the Court confirmed that award. Pursuant to the Court's December 29, 2022 Order (Doc. 72), the Estate is

3. Consistent with the Corrected Final Award, the Estate is **ORDERED** to pay Dramatic **$151,730.89 in interest**;

4. The Estate and LLC are ORDERED to pay, jointly and severally, additional attorneys' fees and costs stemming from the remand of the arbitration totaling $56,090.00. (The Estate and LLC already have satisfied this sum.)

5. The Court **CONFIRMS** the arbitrator's September 2, 2021 Agreed Order ([Doc. 51], Exhibit A]), and declares:

   a. The Estate will not enter into any settlement in the Peck Arbitration or with any of the parties in the Peck Arbitration (Case No. 01 15 0004 7377) involving live stage rights in the presence of an audience that conflicts in any way with any of Dramatic's rights under the 1969 Agreement as such rights are determined in this Arbitration (Case No. 01-19-0000-7463). Any settlement agreement entered into by the Estate in connection with the Peck Arbitration that addresses the issue of stage rights will include a statement that the agreement is subject to Dramatic's stage rights as such rights are determined in this Arbitration or in any appeal thereof.

   b. In the event the Estate seeks a declaration in the Peck Arbitration regarding live stage rights in the presence of an audience it will make clear that any such declaration is subject to Dramatic's stage rights as determined in this Arbitration or in any appeal thereof. In the event the arbitrator in the Peck Arbitration is asked to resolve any issues relating to live stage rights, the Estate will inform the Peck Arbitration arbitrator of the existence of this Arbitration and will provide the Peck Arbitration arbitrator with a copy of all awards and judgments entered in connection with this Arbitration. In no event, will the Estate seek any relief in the Peck Arbitration that would infringe on any stage rights held by Dramatic as such rights are determined in this Arbitration or in any appeal thereof.

---

required to pay 9% interest from the date on which the arbitrator entered his awards. As a result, the Estate is ordered to pay the difference between its September 28, 2022 payment ($2,580,417.42) and the Corrected Final Award amount final award plus 9% interest from the date the award was entered and September 28, 2022 ($2,732,148.31). That difference is **$151,730.89**

    c. The Estate is hereby ordered to take all necessary steps to ensure that the judgment and order in Atticus Corp. et al v. Carter et al, Case No. 22-cv-00059, currently pending in the United States District Court for the Southern District of Alabama are amended to reflect that the agreed order is subject to Dramatic's stage rights as set forth in this judgment or as modified in any appeal thereof.

5.6. The Court **CONFIRMS** the Corrected Interim Award, as clarified by the arbitrator (Does([Doc. 21, 59.1), which provided the following relief]), and declares:

    a. The terms of the original grant in the 1969 Agreement survive termination. Under the 1969 Agreement, Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* ("non-first-class rights" as defined below) and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights.

    b. Dramatic has not infringed the federal copyright protecting *To Kill a Mockingbird*.

    c. Dramatic may continue to license both versions of *To Kill a Mockingbird*. it historically has licensed

    d. The Estate and the LLC shall pay to Dramatic any and all future royalties or other payments they receive from Rudinplay Affiliates or any other person or entity from any non-first-class productions of *To Kill a Mockingbird*.

    e. The Estate and the LLC shall beFor the reasons set forth in the Interim and Final Awards as confirmed by this Court and as referenced in paragraphs 1 and 2 above, pursuant to Fed.R.Civ. P. 65 (d),the Estate and the LLC their officers, agents, servants, employees and attorneys and any other persons who are in active concert or participation with them, shall be permanently enjoined from (i) licensing or granting any third party, including, but not limited to, Scott Rudin ("Rudin") and Rudinplay, Inc., Atticus LLC, any other entity owned, controlled or operated by Scott Rudin, and any entity assigned or licensed rights from Rudinplay (collectively referred to herein as "Rudinplay Affiliates"), any non-first-class stage rights in *To Kill a Mockingbird;* (ii) encouraging, inducing, assisting, approving, or consenting to any wrongful interference with Dramatic's licensees anywhere in the world by Rudin or Rudinplay Affiliates; (iii) encouraging, inducing, assisting, approving or consenting to Rudin's or Rudinplay Affiliates' wrongful licensing of Rudinplay's version of *To Kill a Mockingbird* for any non-first-class production throughout the world; (iv) directly interfering with Dramatic's licensees' licensed non-first-class productions of either version of the Sergel Play; and (v) otherwise interfering with Dramatic's rights to license non-first-class and amateur productions of either version of the Sergel Play.

3

f. The term "first-class rights" is comprised of the theatrical or stage rights for the following categories of dramatic productions of *To Kill a Mockingbird*. All other theatrical or stage rights shall constitute "non-first-class rights."

    i. **Broadway Productions**.
      (a) Broadway Productions are For-Profit Commercial Productions (as defined in section i (b), below) that take place in venues of 500 or more seats located in Manhattan, New York City ("Broadway Theaters"). The production must be governed by the Actors Equity "Production Agreement" or an analogous agreement whose substantive terms and pay scale are substantially the same as the Actors Equity Production Agreement.

      (b) "For-Profit Commercial Productions" consist only of productions that are wholly financed by for-profit entities whose purpose is to provide their investors with a positive return on their investment. The fact that a production may engage for-profit enterprises as part of their production (*e.g.*, a for-profit tour promoter) or otherwise rely on entities that operate for profit, shall not, by itself, render it a "For-Profit Commercial Production."

      (c) At present the following Broadway Theatres whose productions constitute "Broadway Productions" are:

          Ambassador, 215 West 49th Street;
          American Airlines, 227 West 42nd Street;
          Brooks Atkinson, 256 West 47th Street;
          Ethel Barrymore, 243 West 47th Street;
          Vivian Beaumont,150 West 65th Street;
          Belasco,111 West 44th Street; Booth, 222 West 45th Street;
          Broadhurst, 235 West 44th Street;
          Broadway,1681 Broadway;
          Circle in the Square,1633 Broadway;
          Cort,138 West 48th Street;
          Samuel J. Friedman,261 West 47th Street;
          Gershwin,1633 Broadway;
          John Golden, 252 West 45th Street;
          Helen Hayes, 240 West 44th Street;
          Al Hirschfeld, 302 West 45th Street;
          Hudson, 139-141 West 44th Street;
          Imperial, 249 West 45th Street;
          Bernard B. Jacobs, 242 West 45th Street;
          Walter Kerr, 219 West 48th Street;
          Longacre, 220 West 48th Street;
          Lunt-Fontanne, 205 West 46th Street;
          Lyceum,149 West 45th Street;

*Formatted: Font: Not Italic*

          Lyric, 213 West 42nd Street;
          Majestic, 245 West 44th Street;
          Marquis,1535 Broadway;
          Minskoff, 200 West 45th Street;
          Music Box, 239 West 45th Street;
          Nederlander,208 West 41st Street;
          New Amsterdam, 214 West 42nd Street;
          Eugene O'Neill, 230 West 49th Street;
          Palace,1564 Broadway;
          Richard Rodgers,226 West 46th Street;
          St. James,246 West 44th Street;
          Gerald Schoenfeld, 236 West 45th Street;
          Shubert,225 West 44th Street;
          Neil Simon, 250 West 52nd Street;
          Stephen Sondheim,124 W. 43rd Street;
          Studio54, 254 West 54th Street;
          August Wilson, 245 West 52nd Street;
          Winter Garden,1634 Broadway.

(d) The theaters listed above are presumed to be the only Broadway Theaters as of the date of this clarification. However, because the 1969 Agreement could remain in force for a significant amount of time into the future, and new Broadway theaters might be opened or existing theaters might be closed or repurposed into a different type of venue, more flexibility is required. While the theaters listed above are presumed in this clarification to be the only theaters housing Broadway Productions, that presumption is rebuttable. A venue that in the future meets the criteria for a Broadway Production stated herein shall be treated as a Broadway Production. Likewise, a venue that in the future no longer meets the criteria stated herein will no longer be treated as a Broadway Production.

ii. **For-Profit Commercial Productions outside New York City**.
  (a) "For-Profit Commercial Productions outside New York City" as used in this clarification are tours and sit-downs ("sit-downs" are non-touring production) outside of New York City that take place in venues of 500 or more seats and are For-Profit Commercial Productions as defined in section i.(b), above. The production must be governed by the Actors Equity Production Agreement or an analogous agreement whose substantive terms and pay scale are substantially the same as the Actors Equity Production Agreement.

  (b) By way of example, the Dorothy Chandler Pavilion in Los Angeles and the Kennedy Center in Washington D.C. were identified in testimony as theaters having first-class productions that would meet the criteria for this category. The reference to these two theaters is

           for purposes of illustration only and is not intended as an exhaustive list of theaters that now, or in the future, may qualify as For-Profit Commercial Productions.

iii. **Off-Broadway Productions**.
   (a) Off-Broadway productions do not meet the criteria of a Broadway Production because they take place in venues of 100 to 499 seats. Thus, they do not come within the category of "first class" productions. Under the Interim Award, Off-Broadway Productions, in general, fall into the middle-tier category of "stock rights." As such, they are non-first-class rights.

   (b) However, "first-class rights" are clarified to encompass Off-Broadway Productions that are For-Profit Commercial Productions (as defined in section i.(b), above) with an open-ended run and which are governed by an Equity Off Broadway contract or an Equity Production contract. Off-Broadway productions that do not meet these criteria are non-first-class productions. For avoidance of doubt, Off-Off-Broadway productions (productions in theaters in New York City having less than 100 seats) are non-first-class productions.

iv. **West End Productions**.
   (a) Like Broadway Productions, "West End" productions are uniformly considered first-class. West End Theaters are theaters that present For-Profit Commercial Productions (as defined in section i.(b), above) that take place in or near the West End area of London. The production must be governed by British Equity's contract for West End theater productions or an analogous agreement whose substantive terms and pay scale are substantially the same as British Equity's Agreement for Commercial For-Profit West End Theaters.

   (b) At present, the following West End Theaters whose productions constitute "West End Productions" are:
      Adelphi;
      Aldwych;
      Ambassadors (New Ambassadors);
      Apollo;
      Apollo Victoria;
      Cambridge;
      Coliseum;
      Comedy Covent Garden;
      Criterion; Drury Lane;
      Duchess;
      Duke of York's;
      Fortune;

        Garrick;
        Gielgud;
        Haymarket;
        Her Majesty's;
        London Palladium;
        Lyric;
        Mayfair;
        New London;
        Noel Coward;
        Novello Palace;
        Phoenix;
        Piccadilly;
        Playhouse;
        Prince Edward;
        Prince of Wales;
        Queen's;
        St Martin's;
        Savoy;
        Shaftesbury;
        Trafalgar Studio 1;
        Vaudeville;
        Victoria Palace;
        Westminster;
        Wyndham's.

    v.    **Commercial For-Profit Tours in the United Kingdom**. Commercial For-Profit Tours in the U.K., either emanating from or travelling to a West End Theater, that operate under British Equity's contract for West End theater productions or an analogous agreement whose substantive terms and pay scale are substantially the same as British Equity's Agreement for Commercial For-Profit West End Theaters, are first-class productions. To qualify as a "Commercial For-Profit Tour in the U.K.," the tour must be a For-Profit Commercial Production (as defined in section i.(b), above).

    vi.    **Commercial For-Profit Tours or Productions outside the U.S. or U.K**. In any countries other than the United States or United Kingdom, Commercial For-Profit Tours or Productions are tours or productions that operate under a contract with the country's professional theatrical acting union (*e.g.* Canadian Actors' Equity Association) whose pay scale reflects the highest-level pay for any theatrical acting union in that country, or an analogous agreement whose substantive terms and pay scale are substantially the same as such a union contract, are first-class productions. To qualify as a "Commercial For-Profit Tour outside the U.S. or U.K.," the tour must be a For-Profit Commercial Production (as defined in section i.(b), above).

    vii. **Non-First-Class Theaters and Productions**. Any theater or production that does not meet the criteria to qualify for one of the categories in sections 1 through 6, above, is not a first-class theater or production. For avoidance of doubt, the following are presumed to be non-first-class productions and theaters:

  (a) Any production at the Stratford Festival in Canada, the Regent's Park Open Air Theatre in London, the League of Resident Theaters (LORT), regional professional theaters, COST theaters, and CORST theaters.

  (b) Any production operating under any of the following Actors Equity Association contracts:

      Bay Area Project Policy (BAPP);
      Bay Area Theatre;
      Business Theatre and Events;
      Business Theatre & Events Memorandum of Understanding;
      Cabaret;
      Casino;
      Chicago Area Theatre;
      Development;
      Dinner Theatre;
      Disney World;
      Guest Artist;
      Hollywood Area Theatre;
      Letters of Agreement;
      LA 50-Seat Showcase;
      LA 99-Seat Theatre;
      LA Self-Produced Project;
      Midsize Theatres;
      Mini Agreement;
      Musical Stock and Unit Attractions (MSUA);
      New England Area Theatres Agreement (NEAT);
      New Orleans (NOLA);
      NY Showcase;
      Orlando Area Theatre (OAT);
      Off Broadway, except as provided in Section 3;
      Outdoor Drama;
      Short Engagement Touring Agreement (SETA);
      Small Professional Theatre (SPT);
      Special Agreement; Special Appearance;
      Staged Reading Code;
      Theatre for Young Audiences (TYA);
      Transition;
      University/Resident Theatres Association (URTA);
      Western Civic Light Opera (WCLO).

      (c) While the theaters listed in subsection vii.(b), above, are presumed in this clarification to be the non-first-class theaters and productions, that presumption is rebuttable. If in the future a theater or production identified in this section meets the criteria for being a first-class production as set forth in any of the sections i through vi, above, that production shall be treated as a first-class production.

  g. The Estate Shall:
     i. defend, indemnify and hold harmless Dramatic from and against any and all monetary losses or other losses whatsoever, including attorneys' fees, caused by any legal or administrative action brought against Dramatic by any of the following Dramatic licensees: (i) Jonathan Church Productions, (ii) any other licensee theater that had scheduled a production of the Play on the ChurchTour; (iii) Arena Fair Theater at Chappelear Theater, Ohio Wesleyan University; (iv) DeSoto Family Theater performing at Landers Theater Center; (v) Hill Country at Bud El.; (vi) Hart Theater in Hillsboro, Oregon; (vii) Curtain Call; (viii) Azusa Pacific University; and, (ix) any other purely amateur theater that was consented to by Mr. O'Donnell that cancelled a production of TKAM after receiving a cease and desist letter from Rudin or the Estate;

     ii. defend, indemnify and hold harmless Dramatic from or against any and all losses arising from any legal or administrative action brought against Dramatic by Scott Rudin, Aaron Sorkin, Rudinplay, Rudinplay Affiliates, or Atticus, LLC, or any of their licensees or assignees, or anyone on their behalf connected in any way with Dramatic's exercise of its exclusive worldwide rights to license all non-first-class rights in the Sergel Play;

     iii. defend, indemnify and hold harmless Dramatic from or against any and all losses arising from any legal or administrative action brought against Dramatic by any third party as a result of the transfer of any non-first-class rights by the Estate or LLC.

  h. The Estate and the LLC shall account for and shall turn over to Dramatic any payments or royalties received by the Estate or the LLC for any non-first-class rights from Scott Rudin, Rudinplay, any other Rudinplay Affiliate, Aaron Sorkin, or any other secondary theatrical publishing and licensing house.

~~6.~~7. Consistent with the Corrected Interim Award, the Estate is **ORDERED** to pay Dramatic $185,277, plus 9 percent interest from the date of the Corrected Interim Award to January 5, 2023, for a total of **$205,512.51**;

9

~~7.~~8. Pursuant to the Court's order of June 17, 2022 (Doc. No. 42), the Estate and LLC are ORDERED to pay, jointly or severally, Dramatic's attorneys fees and costs in an amount to be determined by the Court~~.~~.

DONE this ___ day of _____, 20__.

                                      _____
                                      MATTHEW F. KENNELLY
                                      UNITED STATES DISTRICT JUDGE

1. **"Declare" vs. "Confirm"**

   A. <u>Respondents' Position</u> — Respondents object to Petitioner's proposed prefatory language throughout the proposed Final Judgment that "the Court declare" various factual and legal findings, as opposed to "confirm[ing]" them. Given the Federal Arbitration Act only authorizes a district court to confirm the arbitrator's award and not to make any independent findings or determinations, Respondents believe that the term "confirm" is more accurate than "declare" and will avoid any confusion regarding whether this Court purported to independently make the same findings and order the same relief as the Arbitrator.

   B. <u>Petitioner's Position</u> — This is a judgment of the Court. A judgment should be complete and self-contained. *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 527 (7th Cir. 1988) (discussing Fed. R. Civ. P. 58). 9 U.S.C. § 13 provides that the judgment incorporates the relief provided by the arbitrator: "The judgment so entered shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered." The declaratory and injunctive relief set forth in the Awards is specific declaratory and injunctive relief awarded by the Court. Accordingly, the Court's "declaration" should be set forth as such just as specific monetary relief is set forth or any other relief described in Fed. R. Civ., P. 58

2. **Paragraph 2 — Post-Award Interest Calculation for Corrected Final Award**

   A. <u>Respondents' Position</u> — Respondents contend that any award of post-award interest for the Corrected Final Award should be calculated from the date of the Modified Interim Award (February 16, 2022) because that is the date on which the award amounts were certain. *See In re Marriage of Polsky*, 899 N.E.2d 454, 468–69 (Ill. App. Ct. 2008); *Presbyterian Distribution Serv. v. Chicago Nat. Bank*, 183 N.E.2d 525, 527 (Ill. App. Ct. 1962). Using this method results in $139,821.39 in post-award interest for the Corrected Final Award.

   B. <u>Petitioner's Position</u> — On January 28, 2022, the arbitrator issued an award that was definite and constituted a sum certain. There was no question that Respondents were obligated to pay that amount and they could have satisfied the amount at any time. While it is true that the arbitrator later increased the Final Award by roughly $20,000, Respondents' obligation to pay the initial amount was never in question. The cases upon which Respondents rely involve situations where there either was no liquidated sum or the original amount was challenged on a motion to reconsider. That is not the case here. Accordingly, Dramatic requests that 9% interest run from January 28, 2022 through February 16, 2022 based on the initial award of $2,556,999 (which would account for an amount of interest of $11,979.36) and from February 16 through September 23, 2022 based on the modified award of $2,577,204 (which would account for an amount of interest of $139,751.53) for a

total interest amount of $151,730.89. If the Court determines that interest begins to run starting on February 16, 2022, the parties agree that the Respondents' interest calculation is correct, but if that the interest starts to run on January 28, 2022, the parties agree that Dramatic's interest calculation is correct.

3. **Paragraph 5(c) — September 2, 2021, Order**

    A. <u>Respondents' Position</u> — Respondents object to the following language Petitioner has proposed regarding the September 2, 2021, order: "The Estate is hereby ordered to take all necessary steps to ensure that the judgment and order in *Atticus Corp. et al v. Carter et al*, Case No. 22-cv-00059, currently pending in the United States District Court for the Southern District of Alabama are amended to reflect that the agreed order is subject to Dramatic's stage rights as set forth in this judgment or as modified in any appeal thereof." In Respondents' view, this language goes beyond mere confirmation of the September 2, 2021, order and essentially asks this Court to issue a separate order directing the Estate to take action that was not the subject of these confirmation proceedings.

    B. <u>Petitioner's Position</u> —Courts have inherent power to enforce their awards. Respondents do not dispute that they failed to comply with the terms of the September 2, 2021 Order. Accordingly, it is within the Court's power to order compliance with its Order and include it as part of the judgment.

4. **Paragraph 6 — Modification of Declaratory and Injunctive Relief**

    A. <u>Respondents' Position</u> — Respondents object to the alteration of the Arbitrator's injunctive and declaratory relief. For example, Petitioner's modified the Arbitrator's injunctive relief with the following introductory clause: "For the reasons set forth in the Interim and Final Awards as confirmed by this Court and as referenced in paragraphs 1 and 2 above, pursuant to Fed. R. Civ. P. 65 (d), the Estate and the LLC their officers, agents, servants, employees and attorneys and any other persons who are in active concert or participation with them, shall be permanently enjoined." This Court has previously found that the confirmed injunction "will be subject to Rule 65 and necessarily bind those in active concert." Doc. 42 at 16. As a result, the Petitioner's modification is unnecessary.

    B. <u>Petitioner's Position</u> — In its June 17, 2022 Memorandum and Order (at page 16), the Court noted "Federal Rule of Civil Procedure 81(a)(3) states that in proceedings under the FAA, the federal rules 'apply only to the extent that matters of procedure are not provided for in those statutes.' Fed. R. Civ. P. 81(a)(3). The FAA does not provide any further procedure relating to injunctions that might otherwise cover the subject matter of Rule 65. So regardless of whether Dramatic formally requests the modification, the eventual judgment will be subject to Rule 65 and necessarily bind those in active concert." Rule 65(d)(1) requires that every order granting an

injunction state the terms of the injunction specifically and describe in reasonable detail the act or acts restrained. Rule 65(d)(2) makes clear that the injunction binds the parties, officers, agents, servants, employees and attorneys and any other persons who are in active concert or participation with them. Inclusion of the language proposed by Dramatic would render a self-contained judgment, with no need for anyone to later consult the arbitration award, the Court's confirmation decision or the federal rules to understand its scope and the entities it binds. As the Seventh Circuit has explained "[a] judicial opinion is not itself an order to act or desist; it is a statement of reasons supporting the judgment. The command comes in the separate document entered under Fed.R.Civ.P. 58, which alone is enforceable. There must be a separate document, with a self-contained statement of what the court directs be done. So if the opinion contains language awarding declaratory relief, but the judgment does not, the opinion has been reduced to dictum; only the judgment need be obeyed." *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 527 (7th Cir. 1988) citing *Azeez v. Fairman*, 795 F.2d 1296, 1297 (7th Cir.1986).