**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE DRAMATIC PUBLISHING COMPANY, | ) ) ) | |
| Petitioner, | ) ) | Case No.: 1:21-cv-5541-MFK |
| v. | ) ) | |
| TONJA CARTER, et al., | ) ) | |
| Respondents. | ) | |

**AMENDED FINAL JUDGMENT ORDER**

This case was initiated by Petitioner Dramatic Publishing Company ("Dramatic") on October 19, 2021, following arbitration proceedings against Respondents The Estate of Nelle Harper Lee, by and through its personal representative Tonja Carter (the "Estate"), and Harper Lee, LLC ("LLC"). This case involved motions to confirm and cross-motions to vacate several awards entered in the arbitration proceedings.

In accordance with the Court's previous Memoranda and Orders and based on the parties' joint motion to amend the previous Final Judgment Order entered by the Court, Judgment is hereby entered in favor of Petitioner Dramatic and against Respondents, and it is hereby **ORDERED AND ADJUDGED** as follows, and the Clerk is directed to enter judgment accordingly:

1. The Corrected Final Award is **CONFIRMED** ([Doc. 35.1]);

2. Pursuant to the Corrected Final Award, the Estate and LLC are joint and severally liable for $2,577,204.00 in attorneys' fees and costs. (The Estate and LLC already have satisfied this sum.)[1]

---

[1] On September 28, 2022, the Estate transferred to Dramatic $2,580,417.42, which represented the fees and costs in the Corrected Final Award plus the 9% interest that accrued after the Court confirmed that award.

3.      Consistent with the Corrected Final Award, the Estate is **ORDERED** to pay Dramatic **$151,730.89 in interest**;

4.      The Estate and LLC are ORDERED to pay, jointly and severally, additional attorneys' fees and costs stemming from the remand of the arbitration totaling $56,090.00. (The Estate and LLC already have satisfied this sum.)

5.      The Court **CONFIRMS** the Corrected Interim Award, as clarified by the arbitrator ([Doc. 21, 59.1]), and declares:

    a.   Dramatic has not infringed the federal copyright protecting *To Kill a Mockingbird*.

    b.   Dramatic may continue to license both versions of *To Kill a Mockingbird*.

    c.   The Estate and the LLC shall pay to Dramatic any and all future royalties or other payments they receive from any  person or entity from any non-first-class productions of *To Kill a Mockingbird*, provided, however, that this obligation shall not include future royalties or payments received by the Estate or LLC from any non-first-class production of the version of *To Kill a Mockingbird* for which Aaron Sorkin was the playwright (the "Sorkin Play").

    d.   The Estate and the LLC shall be enjoined from (i) licensing or granting any third party, excluding Scott Rudin ("Rudin") and Rudinplay, Inc., Atticus LLC, any other entity owned, controlled or operated by Scott Rudin, and any entity assigned or licensed rights from Rudinplay (collectively referred to herein as "Rudinplay Affiliates"), any non-first-class stage rights in *To Kill a Mockingbird*; (ii) encouraging, inducing, assisting, approving, or consenting to any wrongful interference with Dramatic's licensees anywhere in the world by Rudin or Rudinplay Affiliates; (iii) encouraging, inducing, assisting, approving or consenting to Rudin's or Rudinplay Affiliates' wrongful licensing, which shall mean licensing with conditions that seek to prevent or limit licensing of the Sergel Play, of Rudinplay's version of *To Kill a Mockingbird* for any non-first-class production throughout the world; (iv) directly interfering with Dramatic's licensees' licensed non-first-class productions of either version of the Sergel Play; and (v) otherwise interfering with Dramatic's rights to license non-first-class and amateur productions of either version of the Sergel Play.

---

Pursuant to the Court's December 29, 2022 Order (Doc. 72), the Estate is required to pay 9% interest from the date on which the arbitrator entered his awards. As a result, the Estate is ordered to pay the difference between its September 28, 2022 payment ($2,580,417.42) and the Corrected Final Award amount final award plus 9% interest from the date the award was entered and September 28, 2022 ($2,732,148.31). That difference is **$151,730.89**.

e. The term "first-class rights" is comprised of the theatrical or stage rights for the following categories of dramatic productions of *To Kill a Mockingbird*:

    i. **Broadway Productions**.

       (a) Broadway Productions are For-Profit Commercial Productions (as defined in section i (b), below) that take place in venues of 500 or more seats located in Manhattan, New York City ("Broadway Theaters"). The production must be governed by the Actors Equity "Production Agreement" or an analogous agreement whose substantive terms and pay scale are substantially the same as the Actors Equity Production Agreement.

       (b) "For-Profit Commercial Productions" consist only of productions that are wholly financed by for-profit entities whose purpose is to provide their investors with a positive return on their investment. The fact that a production may engage for-profit enterprises as part of their production (e.g., a for-profit tour promoter) or otherwise rely on entities that operate for profit, shall not, by itself, render it a "For-Profit Commercial Production."

       (c) At present the following Broadway Theatres whose productions constitute "Broadway Productions" are:

          Ambassador, 215 West 49th Street;
          American Airlines, 227 West 42nd Street;
          Brooks Atkinson, 256 West 47th Street;
          Ethel Barrymore, 243 West 47th Street;
          Vivian Beaumont,150 West 65th Street;
          Belasco,111 West 44th Street; Booth, 222 West 45th Street;
          Broadhurst, 235 West 44th Street;
          Broadway,1681 Broadway;
          Circle in the Square,1633 Broadway;
          Cort,138 West 48th Street;
          Samuel J. Friedman,261 West 47th Street;
          Gershwin,1633 Broadway;
          John Golden, 252 West 45th Street;
          Helen Hayes, 240 West 44th Street;
          Al Hirschfeld, 302 West 45th Street;
          Hudson, 139-141 West 44th Street;
          Imperial, 249 West 45th Street;
          Bernard B. Jacobs, 242 West 45th Street;
          Walter Kerr, 219 West 48th Street;
          Longacre, 220 West 48th Street;
          Lunt-Fontanne, 205 West 46th Street;
          Lyceum,149 West 45th Street;
          Lyric, 213 West 42nd Street;

Majestic, 245 West 44th Street;
Marquis,1535 Broadway;
Minskoff, 200 West 45th Street;
Music Box, 239 West 45th Street;
Nederlander,208 West 41st Street;
New Amsterdam, 214 West 42nd Street;
Eugene O'Neill, 230 West 49th Street;
Palace,1564 Broadway;
Richard Rodgers,226 West 46th Street;
St. James,246 West 44th Street;
Gerald Schoenfeld, 236 West 45th Street;
Shubert,225 West 44th Street;
Neil Simon, 250 West 52nd Street;
Stephen Sondheim,124 W. 43rd Street;
Studio54, 254 West 54th Street;
August Wilson, 245 West 52nd Street;
Winter Garden,1634 Broadway.

(d) The theaters listed above are presumed to be the only Broadway Theaters as of the date of this clarification. However, because the 1969 Agreement could remain in force for a significant amount of time into the future, and new Broadway theaters might be opened or existing theaters might be closed or repurposed into a different type of venue, more flexibility is required. While the theaters listed above are presumed in this clarification to be the only theaters housing Broadway Productions, that presumption is rebuttable. A venue that in the future meets the criteria for a Broadway Production stated herein shall be treated as a Broadway Production. Likewise, a venue that in the future no longer meets the criteria stated herein will no longer be treated as a Broadway Production.

ii. **For-Profit Commercial Productions outside New York City**.

(a) "For-Profit Commercial Productions outside New York City" as used in this clarification are tours and sit-downs ("sit-downs" are non-touring production) outside of New York City that take place in venues of 500 or more seats and are For-Profit Commercial Productions as defined in section i.(b), above. The production must be governed by the Actors Equity Production Agreement or an analogous agreement whose substantive terms and pay scale are substantially the same as the Actors Equity Production Agreement.

(b) By way of example, the Dorothy Chandler Pavilion in Los Angeles and the Kennedy Center in Washington D.C. were identified in testimony as theaters having first-class productions that would meet the criteria for this category. The reference to these two theaters is for purposes of illustration only and is not intended as an exhaustive

4

list of theaters that now, or in the future, may qualify as For-Profit Commercial Productions.

iii. **Off-Broadway Productions**.
    (a) Off-Broadway productions do not meet the criteria of a Broadway Production because they take place in venues of 100 to 499 seats. Thus, they do not come within the category of "first class" productions. Under the Interim Award, Off-Broadway Productions, in general, fall into the middle-tier category of "stock rights." As such, they are non-first-class rights.

    (b) However, "first-class rights" are clarified to encompass Off-Broadway Productions that are For-Profit Commercial Productions (as defined in section i.(b), above) with an open-ended run and which are governed by an Equity Off Broadway contract or an Equity Production contract. Off-Broadway productions that do not meet these criteria are non-first-class productions. For avoidance of doubt, Off-Off-Broadway productions (productions in theaters in New York City having less than 100 seats) are non-first-class productions.

iv. **West End Productions**.
    (a) Like Broadway Productions, "West End" productions are uniformly considered first-class. West End Theaters are theaters that present For-Profit Commercial Productions (as defined in section i.(b), above) that take place in or near the West End area of London. The production must be governed by British Equity's contract for West End theater productions or an analogous agreement whose substantive terms and pay scale are substantially the same as British Equity's Agreement for Commercial For-Profit West End Theaters.

    (b) At present, the following West End Theaters whose productions constitute "West End Productions" are:
        Adelphi;
        Aldwych;
        Ambassadors (New Ambassadors);
        Apollo;
        Apollo Victoria;
        Cambridge;
        Coliseum;
        Comedy Covent Garden;
        Criterion; Drury Lane;
        Duchess;
        Duke of York's;
        Fortune;
        Garrick;

Gielgud;
Haymarket;
Her Majesty's;
London Palladium;
Lyric;
Mayfair;
New London;
Noel Coward;
Novello Palace;
Phoenix;
Piccadilly;
Playhouse;
Prince Edward;
Prince of Wales;
Queen's;
St Martin's;
Savoy;
Shaftesbury;
Trafalgar Studio 1;
Vaudeville;
Victoria Palace;
Westminster;
Wyndham's.

v. **Commercial For-Profit Tours in the United Kingdom**. Commercial For-Profit Tours in the U.K., either emanating from or travelling to a West End Theater, that operate under British Equity's contract for West End theater productions or an analogous agreement whose substantive terms and pay scale are substantially the same as British Equity's Agreement for Commercial For-Profit West End Theaters, are first-class productions. To qualify as a "Commercial For-Profit Tour in the U.K.," the tour must be a For-Profit Commercial Production (as defined in section i.(b), above).

vi. Commercial For-Profit Tours or Productions outside the U.S. or **U.K**. In any countries other than the United States or United Kingdom, Commercial For-Profit Tours or Productions are tours or productions that operate under a contract with the country's professional theatrical acting union (e.g. Canadian Actors' Equity Association) whose pay scale reflects the highest-level pay for any theatrical acting union in that country, or an analogous agreement whose substantive terms and pay scale are substantially the same as such a union contract, are first-class productions. To qualify as a "Commercial For-Profit Tour outside the U.S. or U.K.," the tour must be a For-Profit Commercial Production (as defined in section i.(b), above).

vii. **Non-First-Class Theaters and Productions**. Any theater or production that does not meet the criteria to qualify for one of the categories in sections

6

1 through 6, above, is not a first-class theater or production. For avoidance of doubt, the following are presumed to be non-first-class productions and theaters:

    (a) Any production at the Stratford Festival in Canada, the Regent's Park Open Air Theatre in London, the League of Resident Theaters (LORT), regional professional theaters, COST theaters, and CORST theaters.

    (b) Any production operating under any of the following Actors Equity Association contracts:

        Bay Area Project Policy (BAPP);
        Bay Area Theatre;
        Business Theatre and Events;
        Business Theatre & Events Memorandum of Understanding;
        Cabaret;
        Casino;
        Chicago Area Theatre;
        Development;
        Dinner Theatre;
        Disney World;
        Guest Artist;
        Hollywood Area Theatre;
        Letters of Agreement;
        LA 50-Seat Showcase;
        LA 99-Seat Theatre;
        LA Self-Produced Project;
        Midsize Theatres;
        Mini Agreement;
        Musical Stock and Unit Attractions (MSUA);
        New England Area Theatres Agreement (NEAT);
        New Orleans (NOLA);
        NY Showcase;
        Orlando Area Theatre (OAT);
        Off Broadway, except as provided in Section 3;
        Outdoor Drama;
        Short Engagement Touring Agreement (SETA);
        Small Professional Theatre (SPT);
        Special Agreement; Special Appearance;
        Staged Reading Code;
        Theatre for Young Audiences (TYA);
        Transition;
        University/Resident Theatres Association (URTA);
        Western Civic Light Opera (WCLO).

    (c) While the theaters listed in subsection vii.(b), above, are presumed in this clarification to be the non-first-class theaters and productions,

7

that presumption is rebuttable. If in the future a theater or production identified in this section meets the criteria for being a first-class production as set forth in any of the sections i through vi, above, that production shall be treated as a first-class production.

f.  The Estate Shall:

   i.  defend, indemnify and hold harmless Dramatic from and against any and all monetary losses or other losses whatsoever, including attorneys' fees, caused by any legal or administrative action brought against Dramatic by any of the following Dramatic licensees: (i) Jonathan Church Productions, (ii) any other licensee theater that had scheduled a production of the Play on the ChurchTour; (iii) Arena Fair Theater at Chappelear Theater, Ohio Wesleyan University; (iv) DeSoto Family Theater performing at Landers Theater Center; (v) Hill Country at Bud El.; (vi) Hart Theater in Hillsboro, Oregon; (vii) Curtain Call; (viii) Azusa Pacific University; and, (ix) any other purely amateur theater that was consented to by Mr. O'Donnell that cancelled a production of TKAM after receiving a cease and desist letter from Rudin or the Estate;

   ii.  indemnify and hold harmless Dramatic from or against any and all losses, including reasonable attorneys' fees, arising from any legal or administrative action brought against Dramatic by Scott Rudin, Sorkin, Rudinplay, Rudinplay Affiliates, Atticus, any of their licensees or assignees, or anyone on their behalf connected in any way with Dramatic exercising its non-exclusive worldwide rights to license non-first-class productions of the Sergel Play under the terms of the Amended Final Judgment Order. For avoidance of doubt, the Estate shall owe no indemnity obligation to Dramatic for any claim alleging that (a) Dramatic or its licensees have improperly utilized proprietary elements (i.e., any elements protectable under copyright, trademark or other applicable laws) of any production of the Sorkin Play; or (b) Dramatic's licensee made a material deviation from the script of the licensed version of the Sergel Play. The Estate shall also owe no indemnity obligation to Dramatic for any claim in which a court expressly determines that Dramatic violated the 25-mile licensing restriction provision of the 1969 Agreement and such determination is final and non-appealable.

   For further avoidance of doubt, nothing in this provision shall give Dramatic or its licensees the right to license or produce a first-class production, as defined above, of the Sergel Play, nor shall Dramatic have any right to indemnification from the Estate under the preceding paragraph with respect to such first-class production should Dramatic or its licensee license or produce a first-class production, as defined above, of the Sergel Play and a court expressly finds in a final judgment order that Dramatic licensed a production falling within the definition of "first-class rights" as set forth in

8

the Judgment and all appeals with respect to such final judgment order have been exhausted;

iii. defend, indemnify and hold harmless Dramatic from or against any and all losses arising from any legal or administrative action brought against Dramatic by any third party as a result of the transfer of any non-first-class rights by the Estate or LLC, provided, however, that this obligation shall not apply to a legal or administrative action brought by a third party to whom non-first-class rights to produce the Sorkin Play have been transferred.

6. Consistent with the Corrected Interim Award, the Estate is ORDERED to pay Dramatic $185,277 plus 9 percent interest for a total of $205,740.96. (The Estate already has satisfied this sum.);

7. Pursuant to the Court's order of June 17, 2022 (Doc. No. 42), the Estate and LLC are ORDERED to pay, jointly or severally, Dramatic's attorneys fees and costs in an amount to be determined by the Court.

Done this 12th day of November 2025.

MATTHEW F. KENNELLY
UNITED STATES DISTRICT JUDGE